UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

ANNA FOLEY,

                Plaintiff,                Case No.: 10-cv-12668
                                              Honorable Victoria A Roberts
        v.                                   Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 15]**

      Plaintiff Anna Foley brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits under the Social Security Act ("SSA"). Both parties have filed summary judgment motions [12, 15] which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

      For the reasons set forth below, the court finds that the Administrative Law Judge's decision rests on the application of correct legal standards and is supported by substantial evidence. Accordingly, the court recommends that the Commissioner's motion for summary judgment [15] be granted, that Foley's motion for summary judgment [12] be denied, and that the Commissioner's findings be affirmed.

**II.     REPORT**

   **A.     Procedural History**

On February 6, 2006, Foley filed an application for Disability Insurance Benefits, alleging disability as of January 23, 2006. (Tr. 75). The claim was denied initially on May 23, 2006. (Tr. 48). Thereafter, Foley filed a timely request for an administrative hearing, which was held on March 19, 2008, before Administrative Law Judge Jerome Blum ("ALJ"). (Tr. 22). Foley, represented by attorney Barry Keller, testified, as did Vocational Expert Elizabeth Pasikowski ("VE"). (Tr. 46, 403). On May 28, 2008, the ALJ found that Foley was not disabled. (Tr. 11-20). On May 7, 2010, the Appeals Council denied review. (Tr. 4-7). Plaintiff filed for judicial review of the final decision on July 6, 2010. [1].

   **B.     Background**

   *1.     Disability Reports*

In a disability report completed in February 2006, Foley stated that the following impairments prevented her from working: cardiomyopathy, depression, liver enzymes, back problems, high blood pressure ("HBP") and asthma. (Tr. 68). According to Foley, these impairments, as well as a recently discovered blood clot in her heart, resulted in the following functional limitations: tires easily, shortness of breath, and chest pains if walking more than 5 or 10 minutes. (Tr. 69). The disability report indicates that Foley had been prescribed Albuteral for her asthma, Asprin, Coreg and Prinavil for her heart, Lovenox for her blood clots and Fierocet for headaches. (Tr. 72).

In a March 2006 function report, Foley described her typical day. (Tr. 89). She would "wake up, take medicine, eat breakfast, talk with friends, go to doctor appointments, come home, eat lunch, take a nap, watch a movie or go grocery shopping, eat dinner, read a book, take a

2

bath," and "go to bed." (*Id.*). Foley stated that she was capable of preparing her own meals, as well as doing dishes and vacuuming, but that she needed assistance carrying her laundry basket because she had to take it to a laundry mat. (Tr. 91). Foley said that "if I had a washer I could do it at home without help." (*Id.*).

### 2. *The March 2008 Hearing Before the ALJ*

Foley and the VE testified at the hearing on March 18, 2006. Foley was represented by her present counsel and both the ALJ and counsel elicited testimony from the witnesses.

#### a. *Foley's Testimony*

Foley testified to neck, leg and back pain including degenerative joint disease in her back, heart conditions including high blood pressure, a blood clot, and a rapid heartbeat, dizziness, asthma, gynecological problems, headaches and depression. (Tr. 407, 411-424). With regards to the neck, back and leg pain, Foley testified that this was the most disabling; she could not sleep through the night because of the pain in her legs and back, and sometimes she did not get out of bed on a given day because of it. (Tr. 411, 419). She testified that during the course of a month, she would stay in bed "[a]t least four or five days." (Tr. 419). Foley testified that a recent surgery on her knee was successful, but that the knee still gave out often. (Tr. 411). She testified that she had been prescribed Motrin 800 and Darvocet for the arthritic pain and degenerative disc disease and was being compliant with her medication, but when asked if it was helping she testified "[n]ot really." (Tr. 421, 422).

With regards to her heart condition, Foley testified that she was being treated for a thrombus in her heart, which was diagnosed in 2006 and, according to Foley, was still present at the time of the hearing in 2008. (Tr. 415-16). She testified that she was going to take care of it

with medication. (Tr. 416).[1] Later, Foley testified that she had been taking Lovenox, but that she stopped taking it because "the shots were very painful," and had ultimately been taken off of it and the doctor was looking into replacing it with another medication. (Tr. 418). Foley testified that she was also being treated for high blood pressure, which was partially caused by her weight, and that the dosage of her blood pressure medication, Coreg, was recently increased. (Tr. 412-13, 423). She testified that she suffered dizzy spells, rapid heartbeat, shortness of breath and light-headedness, mostly when she engaged in physical activity, (Tr. 412, 418), though she also experienced dizziness when she had migraine headaches. (Tr. 412). She testified that she had been admitted to the hospital after having a dizzy spell. (Tr. 417-18). Foley testified that she had abstained from alcohol since August 13, 2004. (Tr. 414).

With regard to her asthma, Foley testified that she used a nebulizer and an inhaler. Foley testified that she had two gynecological surgeries in 2008: a partial hysterectomy and another to remove fibroids and detach her uterus from her abdominal wall. (Tr. 420). Foley testified that she was very depressed and that she often stayed in bed because of her depression. (Tr. 419). She testified that her aunt and uncle had filed for guardianship of her minor child when she went into the hospital for "post max stress." (Tr. 421-22). Foley testified that her doctors had given her medication for her depression which "made [her] very sick." (Tr. 419).

Foley testified that she graduated from high school and took some college classes. (Tr. 405). She lived in a one-bedroom, first-floor apartment with laundry in her apartment, and she said she was "pretty much" able to take care of herself, but that she "sometimes" needed help "with laundry and lifting stuff." (Tr. 405-406). When asked about her daily activities, Foley testified that she usually got up around 11:00 a.m. and retired to bed around 9:00 p.m. (Tr. 406).

---

[1] The medical records show that her thrombus had healed by the time of the hearing and that she was already on medication for it. (Tr. 252).

During the day she sometimes would visit her son or go to a community center and watch a movie. (*Id.*). When she was at home she would read or watch television. (*Id.*). She would often be up in the night because of the pain in her back and legs. (Tr. 407).

Foley testified that she last worked in January of 2006 as a food preparer and cashier, but stopped working when she suffered from chest pains that sent her to the hospital. (Tr. 408-09). Before that she had worked sporadically in various retail and food service positions, but then "would get sick and have to leave work." (Tr. 409-411). When the ALJ asked whether Foley had ever had any sit-down type jobs, she replied "No, sir." (Tr. 422). When asked if it bothered her to sit for any length of time she replied that it did because "I have pain in my neck and I can't even – I have trouble getting up from the chair." (Tr. 422).

### b. *Vocational Expert's Testimony*

The VE also testified at the hearing. When asked about the categories of Foley's previous work of over one year in duration, the VE categorized them as being either unskilled light or unskilled medium, either in retail or in food preparation. (Tr. 424). The ALJ then asked the VE to hypothesize that if Foley were "able to do a job from a seated position," what types of jobs would exist for someone who has no transferrable skills. (Tr. 425). The VE responded that there were 1,800 jobs as a security monitor, 1,300 jobs as an ID clerk, 1,400 jobs as an information clerk, and 4,200 jobs as a reception clerk available to someone with those limitations. (*Id.*). According to the VE, these jobs could be performed either sitting or standing, would require the employee to be able to lift five pounds, and would require the employee "to be attentive and non-tasked [sic] for about 80 percent of the time." (Tr. 426-427). The ALJ then asked, "So that if we accept the claimant's complaints about sitting and standing, would that pretty much prohibit that work?" to which the VE responded, "Yes." (Tr. 426). The ALJ also

asked the VE whether the identified jobs would put the employee "under any production quotas, or any minimum amount of work," and the VE confirmed that such demands were not part of those jobs. (*Id.*) When asked by counsel what the effect would be of "the hypothetical claimant indicat[ing] she needed to stay in bed four or five days a month," the VE responded "[t]hat would be preclusive over time." (*Id.*).

### 3. Medical Evidence

#### a. Treating Sources

In January 2006, Foley was hospitalized for several days with chest pain. (Tr. 166-243). She was diagnosed with atypical chest pain that had resolved upon hospitalization, apical thrombus, a possible hypercoagulable state, cardiomyopathy with an ejection fraction of 30-35%, hypertension, asthma, migraine headaches, depression and anxiety. (Tr. 166). Foley was stabilized with Lovenox injections for the thrombus and, upon discharge, advised to perform activity as tolerated and refrain from strenuous activity. (Tr. 168).

On February 7, 2006, one of Foley's treating physicians, Dr. Bernard Bercu, conducted two residual functional capacity ("RFC") assessments of Foley for the State of Michigan. (Tr. 244-47). In the first assessment, Dr. Bercu indicated that Foley could lift up to ten pounds occasionally, could stand and walk each for two hours in an eight-hour work day, and could not use her arms and hands for "repetitive action" involving "reaching," "pushing/pulling," or "fine manipulation." She could use them, however for repetitive "simple grasping." (Tr. 244-45). In the second assessment, Dr. Bercu indicated that Foley could only lift up to five pounds occasionally, and could sit for less than six hours and stand or walk together for less than two hours in an eight-hour work day. (Tr. 246-47). Dr. Bercu's second assessment found the same limitations in Foley's "repetitive action" use of her arms and hands, and in addition, found that

she could not use her feet or legs to repetitively "operat[e] foot/leg controls." (Tr. 247)

In March 2006, another of Foley's treating physicians, cardiologist Dr. Russell Steinman, wrote a letter to Dr. Bercu explaining that he had examined Foley and found that the apical thrombus had healed. (Tr. 252). Dr. Steinman noted that Foley's ejection fraction had increased to being "borderline," and that he did not note any dysrhythmia in her heart. (*Id.*).

A CT scan of Foley's brain in June 2006 was negative for any acute intracranial process. (Tr. 297). A CT scan of her cervical spine at the same time revealed no osseous abnormality and that the cervical vertebral height, alignment and disc spaces were preserved. (Tr. 392). An MRI of Foley's lumbar spine taken the same day was unremarkable and showed that the "alignment, marrow signal and vertebral heights of the lumbosacral spine [were] preserved." (Tr. 296). An X-Ray of Foley's lumbar spine, taken in July 2006, revealed only minimal spondylosis, or narrowing, without acute abnormality. (Tr. 382). In August 2006, Dr. Danny Watson, who treated Foley's complaints of pain, noted that "[t]here is no abnormality on portions of the tests that do not require subjective judgments on the part of the patient." (Tr. 283).

A follow-up ECG was performed on Foley in September 2006 that indicated that her left ventricle size was in the upper range of normal, that her overall ejection fraction was above 55 percent, which was normal, but there was "the suggestion of infernoseptal wall motion abnormality." (Tr. 309). Chest X-rays done that same month revealed "no active intrathoracic disease." (Tr. 379).

In a letter to Dr. Bercu dated September 7, 2006, Dr. Steinman noted that Foley's cardiomyopathy was now "well compensated," and that she was "active, play[ing] soccer with her kids." (Tr. 304). He recommended placing a Holter monitor on Foley to track any arrhythmias. (*Id.*). In an October 2006 letter, Dr. Steinman noted that the Holter monitor

showed "some premature ventricular complexes," but had not shown any ventricular tachycardia. The letter also stated that since her last visit, Foley had "not had palpitations, lightheadedness, pre-syncope or syncope." (Tr. 303). Dr. Steinman noted that Foley's ejection fraction was "normal" at 55 percent. (*Id.*). Based upon this, he concluded that consideration of implantation of a cardioverter-defibrillator was not urgent. (*Id.*).

In December 2006, Foley underwent a myocardial perfusion imaging stress test which indicated coronary artery disease. (Tr. 375). The test also determined that her cardiac wall motion appeared normal, and her ejection fraction was 57 percent. (*Id.*).

In April 2007, Dr. Steinman performed a follow-up exam on Foley where he determined that she had "had an excellent recovery and she now has a normal ejection fraction." (Tr. 302).

In August 2007, Foley underwent surgery for a torn meniscus in her left knee. (Tr. 317). An MRI performed on the knee a month earlier had noted the torn meniscus, as well as moderate degenerative changes in her knee. (Tr. 369-70). On August 29, 2007, Foley's surgeon, Dr. Edward Lis, noted that the Foley was doing well post-operation and that "work is not an issue." (Tr. 323-24). At a follow-up appointment in September, Dr. Lis's report indicates that Foley continued "to have some pain", but that her knee had full range of motion and normal strength and stability. (Tr. 310-12).

In November 2007, Foley went to the emergency room complaining of chest pains, shortness of breath, dizziness and headaches. (Tr. 346). The emergency room report indicates that Foley was not compliant with her Lovenox and that her lungs were clear. (Tr. 346-47).

In January 2008, in response to complaints of pelvic pain and excessive bleeding, Foley underwent a laparoscopy and hysterectomy. (Tr. 330). Her surgeon, Dr. Jonathan Zaidan, cleared Foley for work starting February 26, 2008. (Tr. 329).

### b. *Consultative and Non-Examining Sources*

In April 2006, two consultative examinations were performed on Foley. The first, which addressed Foley's mental health, was performed by Dr. Wladimir Zarski. Dr. Zarski observed that Foley was in counseling for substance abuse, and that she reported having "been abstinent from alcohol and prescription drugs since July or August of 2004." (Tr. 256) He noted that she appeared sad, had a depressed mood, had a fear of dying and feelings of guilt, but that she did not have hallucinations or delusions, and did not currently possess any suicidal or homicidal thoughts. (Tr. 257). Dr. Zarski diagnosed Foley with an adjustment disorder with depressed mood and a history of alcohol dependence and prescription analgesic abuse. (Tr. 258). He assigned Foley a global assessment of functioning ("GAF") score of 61.

The second consultive exam, which addressed Foley's physical health, was performed by Dr. Michael Khoury. (Tr. 260). Dr. Khoury noted that Foley had been diagnosed with cardiomyopathy and that she reported that this caused her to have arrhythmias and to get tired easily. (*Id.*). Dr. Khoury noted that Foley stated that she was recently diagnosed with depression but that she had not seen a psychiatrist for it. (*Id.*). He also documented that Foley reported chronic back pain, but that "no diagnostic imaging ha[d] been done of her lower back . . . ." (*Id.*). While he noted that "she describes it as a four to five out of a ten pain scale," and that "[s]he states she's limited in her daily activities with walking half a block, [and] stand[ing] three to four hours," she had "had no treatment of physical therapy, epidurals, or surgery of her lower back . . . and has no difficulty sitting." (*Id.*). During his physical exam of Foley, Dr. Khoury noted that normal S1 and S2 sounds were heard in her heart and that he did not appreciate any "murmurs or gallops." (Tr. 261). With regards to her musculoskeletal exam, Dr. Khoury observed that "[r]ange of motion of all joints checked is full," that "[s]traight leg raising is

9

negative," and that "[g]rip strength is intact. The hands have full dexterity. The patient was able to pick up a coin, button a button, and open a door without difficulty." (*Id.*). He concluded that her musculoskeletal exam was "normal." (Tr. 262).

In May 2006, Foley's medical records were reviewed by Dr. Byong-Du Choi to assess Foley's RFC. (Tr. 124-130). Dr. Choi noted that an x-ray showed moderate arthritis in Foley's right knee, and that a recent heart catheter showed she had a heart ejection fraction of 30-35%. (Tr. 125). He also noted that Foley's range of motion and gait were within normal limits and that her asthma was under control. (*Id.*). Dr. Choi determined that Foley was able to lift up to twenty pounds occasionally, up to ten pounds frequently, stand and/or walk approximately six hours in an eight-hour work day, and sit approximately six hours in an eight-hour workday. (Tr. 124). Dr. Choi determined that Foley could frequently balance, kneel, crouch or crawl, and could climb and stoop occasionally. (Tr. 125). Dr. Choi found no manipulative limitations and determined that Foley was able to push or pull without restriction, including the use of hand or foot controls. (Tr. 124, 126). Dr. Choi determined that Foley should avoid concentrated exposure to physical hazards and avoid moderate exposure to fumes, odors, dusts, and other respiratory hazards. (Tr. 127).

### C.  Framework for Disability Determinations

Under the SSA, Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The SSA defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The ALJ's Findings

The ALJ determined that Foley was not disabled based on the following findings.  At step one, the ALJ found that Foley had not engaged in substantial gainful activity since January 26,

2006.[2]   (Tr. 16).  At step two, the ALJ determined that Foley had the following severe impairments: "cardiomyopathy and an adjustment disorder, and status post arthroscopic surgery on her left knee." (*Id.*).  At step three, the ALJ then found that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (Tr. 18).  At step four, the ALJ determined that Foley's "heart problem is under satisfactory control…and there is no basis to preclude her from all sedentary work." (Tr. 18)  He also effectively adopted treating Dr. Bercu's RFC assessment that Foley could lift up to ten pounds and stand/walk for two hours out of an eight hour work day, and found it consistent with sedentary activity.  (Tr. 17, 18).  While the ALJ accepted Dr. Zarski's finding that Foley was depressed, he also noted Dr. Zarski's finding that "her reality contact, thought process and memory were all essentially unimpaired" and that her GAF score of 61 was "not consistent with disabling psychiatric symptoms." (*Id.*).  Finally, while finding that Foley's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," the ALJ concluded that her "statements concerning the intensity, duration, and limiting effects of these symptoms [were] not entirely credible." (*Id.*).  The ALJ found Foley's credibility at the hearing to be "rather poor," in that "[h]er testimony of daily dizzy spells, a fast heart beat, and degenerative disc disease in her back and neck was not adequately corroborated by the medical [evidence] . . . ." (*Id.*).  Despite this, he still gave "some credit to [Foley's] physical and mental discomfort" when making his determination about what kind of work she could perform.  (*Id.*).  The ALJ then found that Foley could not perform any of her past relevant work as a food preparer, cashier or retail clerk.  (Tr. 18-19).

   Finally, at step five, the ALJ concluded that, based on the RFC assessment and the testimony of the VE, Foley retained the residual functional capacity to perform unskilled

---

[2]   As noted above, Foley's alleged onset date was January 23, 2006.  (Tr. 75).  The court assumes that the ALJ meant to use that date as the date assessed in Step 1, since he notes in his decision that "[t]here is no evidence that the claimant has engaged in substantial gainful activity since her alleged onset date." (Tr. 16)

12

sedentary nonindustrial service work, of which there existed a significant number of qualifying jobs in the national economy, and thus Foley was not disabled as defined by 20 CFR §§ 404.1520(g) and 416.920(g).  (Tr. 19).

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499

13

F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that the ALJ discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F. Analysis

In her brief, Foley argues that the ALJ "failed to consider the degrees, severity and intensity of Plaintiff's medical conditions." (Pl. Mot. Summ. J. at 6). Specifically, Foley argues that the ALJ, in his determination, failed to discuss her "blood disorder,"[3] or account for Dr. Bercu's conclusion, in his RFC exam of February 2006, that Foley had limited use of her hands. (*Id.*). She further argues that the ALJ failed to acknowledge that "Dr. Khoury's diagnosis was made on the basis of a clinical non-cardiac examination."[4] (*Id.*). Finally, Foley argues that the ALJ erred in his finding that she was less than credible, specifically with regard to her inability

---

[3] While not specific as to what blood disorder Foley is referring, the court assumes it is her possible hypercoagulable state.

[4] Foley fails to identify which of Dr. Khoury's diagnoses she specifically takes issue with, as he performed a full physical assessment, including cardiological, and musculoskeletal exams. However, the context makes clear that she is challenging Dr. Khoury's cardiological findings, and the court will address that aspect of his examination.

to report to work on a sustained basis, as borne out in the testimony of Foley and the VE, most notably the testimony that if Foley were to remain in bed four or five days a month, it would eventually affect her ability to maintain a job. (*Id.* at 3, 6). Foley concludes that had the ALJ fully considered her case, she would have been awarded a closed period of disability from February 6, 2006 through February 26, 2008, when the surgeon who performed her knee surgery cleared her for work.[5] (*Id.* at 6).

First, the ALJ fully considered Foley's blood disorder in his decision. Foley's hypercoagulable state was part of the heart condition for which she was being treated with Lovenox. (Tr. 168). The ALJ acknowledged that Foley documented her blood clotting disorder, (Tr. 16), yet he determined that her "heart problem is under satisfactory control with medication therapy . . . [h]er blood clot was successfully treated with Lovenox." (Tr. 18). Furthermore, the ALJ noted that her "stable cardiac situation" was "despite some noncompliance with the Lovenox." (*Id.*). In addition, there is nothing in the record that specifies any functional limitation due to a thrombus. At best, Foley's hospital discharge instructions to refrain from strenuous activity limited her to more sedentary activities while the thrombus was healing. (Tr. 168). With regard to her possible hypercoagulable state, it is Foley's burden to prove that this condition is severe, in that it imposes significant restrictions on her ability to perform basic work activities. *See* 20 C.F.R. § 404.1520(c); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (plaintiff bears the burden at the first four steps). Yet, Foley offers no argument or evidence as to the severity of this condition or how it would prevent her from engaging in the type of sedentary work the ALJ found she could perform.

---

[5] Foley does not explain the reasoning for the request for the new onset date, which appears to coincide with the date of her application. Nor does she explain the reason for a closed benefits period ending with the completion of her knee surgery, especially when her arguments for disability are premised upon conditions other than just her knee.

Second, the court rejects Foley's argument that the ALJ failed to properly account for Dr. Bercu's conclusions about Foley's limited use of her hands. Foley waived the issue because she neither listed a hand restriction as a basis for seeking disability in her initial application for benefits, (Tr. 61-65), nor testified about any hand-related limitations at her hearing despite being pointedly asked by the ALJ whether "there are any other reasons you feel you could not be gainfully employed…" (Tr. 404-21)[6] Foley's argument also mischaracterizes the nature of Dr. Bercu's findings. Although Dr. Bercu did indicate that Foley could not use her hands and arms for *repetitive* "reaching," "pushing/pulling," and "fine manipulation," he also indicated that the cause of that limitation was not a problem with Foley's arms and hands themselves, but rather "heart disease with systolic dysfunction." (Tr. 247) In other words, the problem, according to Dr. Bercu's report, was not with Foley's mere use of her hands, but rather, their repetitive use in a way that would implicate the heart condition he found to exist. This view of her condition is consistent with Foley' own testimony that: (1) she stopped work not because of a problem with her hands or arms, but because of chest pains, (Tr. 409), (2) her overall limitations were caused by "doing physical stuff," (Tr. 412), and (3) she was able to use her hands to engage in activities such as preparing her own meals, doing dishes, vacuuming, washing her clothes, bathing and dressing. (Tr. 91, 406-08) It is also consistent with the findings of both Dr. Khoury (that Foley's

---

[6] *See, e.g.*, *Motin v. Comm'r of Soc. Sec.*, 2010 WL 1754821, at *3 (E.D. Mich. April 30, 2010) (claimant waived alleged illiteracy disability by not raising it in her benefits application or at the hearing before the ALJ) (citing *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir.2003) ("[Claimant] never alleged any limitation in function as a result of his obesity in his application for benefits or during the hearing. Accordingly, this claim was waived from being raised on appeal.") and *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir.1999) ("when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal.")). *See also Pena v. Charter*, 76 F.3d 906, 909 (8th Cir. 1996) (claimant who fails to list alleged disabling condition in application for benefits, or testify to condition at administrative hearing, waives ability to raise issue on appeal, regardless of whether evidence exists in the record to support claim).

"hands have full dexterity" (Tr. 261)) and Dr. Choi (that Foley had no manipulative limitations and could push and pull without restriction, but that she needed to avoid physical hazards). (Tr. 124, 126-27). Finally, the ALJ adequately accounted for Foley's "repetitive action" restrictions by limiting her to a subset of "all sedentary work," – "unskilled nonindustrial sedentary service work" (Tr. 18) – which, as explained at the hearing, would require her to remain on task about 80 percent of the time while not placing her "under any production quotas or any minimum amount of work as in the industrial field…" and being "non-hazardous." (Tr. 426-27)

Third, the ALJ did not err in the weight given to Dr. Khoury's clinical, non-cardiac assessment of Foley. The conclusions reached by Dr. Khoury and cited by the ALJ in his opinion, that Foley's heart did not appear to be enlarged, that he did not detect any murmurs or gallops and that her sinus rhythms were normal, were corroborated by other substantial evidence in the record, including the findings of Dr. Steinman, Foley's treating cardiologist. (Tr. 252, 302).

Finally, the ALJ did not err in finding Foley's testimony less than credible. The ALJ's determination of Foley's credibility is entitled to significant weight. *Walters*, 127 F.3d at 531; *Reynolds v. Comm'r of Soc.* Sec., 424 Fed. Appx. 411, 417 (6th Cir. 2011) ("an ALJ's credibility assessment will not be disturbed absent compelling reason"). In addition, Foley's testimony that her conditions make her tired and unable to get out of bed several days a month does not find support in the objective medical record. None of the doctors who examined Foley or her medical records, including her treating physician, found that Foley was under excessive fatigue from her conditions. To the extent that Dr. Khoury's report stated that Foley gets tired, it was based solely on her own self-reporting, which is not entitled to controlling weight. (Tr. 260); *Williams v. Astrue*, No. 09-cv-042, 2010 U.S. Dist. LEXIS 10781 at *24 (E.D. Tenn. Feb. 8, 2010)

(physician's assessment based on claimant's "dubious" self-reporting entitled to minimal weight). Finally, the ALJ did not discount Foley's testimony entirely. He specifically gave some weight to her complaints of "physical and mental discomfort" when determining her ability to work. (Tr. 18). Because the evidence supporting Foley's testimony about the severity of her disabilities was not supported by the medical evidence, the ALJ did not err in affording it less weight.

### III.   CONCLUSION

For the foregoing reasons, it is RECOMMENDED that Defendant's motion for summary judgment [15] be GRANTED, that Plaintiff's motion for summary judgment [12] be DENIED, and that the Commissioner's findings be AFFIRMED.

Dated: February 3, 2012                s/David R. Grand
      Ann Arbor, Michigan              DAVID R. GRAND
                                             United States Magistrate Judge

### NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 3, 2012.

                                        s/Felicia M. Moses
                                        FELICIA M. MOSES
                                        Case Manager